UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ELISABETH HARNEY, ET AL.         CIVIL ACTION

VERSUS                         NO: 16-1998

SELECT PORTFOLIO SERVICING,     SECTION: "J"(3)
INC.

## ORDER

Before the Court is a *Motion for Summary Judgment* **(Rec. Doc. 49)** filed by Defendant, Select Portfolio Servicing, Inc. Plaintiffs, Elisabeth Harney and Noel Harney, filed an opposition thereto (Rec. Doc. 68), and Defendant filed a reply (Rec. Doc. 76). Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that the motion should be **GRANTED.**

## FACTS AND PROCEDURAL BACKGROUND

Plaintiffs, Elisabeth and Noel Harney (collectively, "Plaintiffs"), are the owners of property (the "Property"), subject to a mortgage serviced by Select Portfolio Servicing, Inc. ("SPS").[1] The Property sustained damage as a result of Hurricane Isaac on August 28, 2012. Plaintiffs filed insurance claims for the damage, and eventually settled the claims, resulting in the insurance proceeds at issue in this matter. Between September 2012 and August 2014, seven insurance checks totaling $108,744.74

---

[1] SPS became the servicer of the mortgage on August 16, 2012.

were issued to Plaintiffs for repairs, each naming SPS as payee. The checks were forwarded to SPS and SPS deposited the funds in a restricted escrow account.[2]

Plaintiffs executed a Private Repairs Affidavit on December 20, 2012, whereby Plaintiffs elected to repair the damages to the Property themselves. Pursuant to SPS' policies for monitoring private repair claims, SPS disbursed $10,000 of the insurance proceeds to Plaintiffs on January 31, 2013, for Plaintiffs to begin their repairs. On February 20, 2013, Plaintiffs called SPS to request an inspection of repairs so another disbursement could be made. SPS' vendor, Safeguard Properties ("Safeguard"), performed an inspection on February 28, 2013, and concluded that Plaintiffs had completed 25% of the repairs. However, after further review of the photographs, Safeguard reduced the completion percentage to 9%. Plaintiffs' property was never inspected again and Plaintiffs never received an additional disbursement of the insurance proceeds.

Plaintiffs' attorney sent four letters to SPS in 2013 requesting the release of the remaining insurance proceeds so that Plaintiffs could continue repairing the Property. Plaintiffs allege that SPS did not respond to any of the letters. Plaintiffs also sent two Qualified Written Requests ("QWRs"), as defined by

---

[2] From that account, SPS paid over $30,000 in attorney's fees and costs incurred by Plaintiffs.

12 U.S.C. § 2605(e), to SPS requesting, *inter alia*, an accounting of the retained insurance proceeds. Plaintiffs assert that SPS did not respond to the QWRs. By letter dated January 6, 2014, Plaintiffs sent notice to SPS that the Property was uninhabitable and requested that all correspondence regarding the Property be sent to Plaintiffs' counsel.

Plaintiffs fell behind on their mortgage loan in 2013, and on March 24, 2015, SPS sent a letter to Plaintiffs stating that SPS would apply the remaining insurance proceeds to the balance of the mortgage if Plaintiffs did not respond. The letter was returned, marked "Return to Sender Vacant Unable to Forward." SPS applied the remaining insurance proceeds in the amount of $59,104.38 to Plaintiffs' mortgage on May 5, 2015. Jefferson Parish subsequently condemned the Property and the Property was demolished on September 27, 2016.

On March 9, 2016, Plaintiffs filed the instant lawsuit alleging a cause of action under the Real Estate Settlement Procedures Act ("RESPA"), and state law causes of action for breach of contract, conversion, and unjust enrichment. SPS filed the instant *Motion for Summary Judgment* (Rec. Doc. 49) on January 25, 2018. Plaintiffs oppose the motion (Rec. Doc. 68) and SPS filed reply (Rec. Doc. 77). SPS' motion is now before the Court on the briefs and without oral argument.

**PARTIES' ARGUMENTS**

Plaintiffs' complaint alleges four separate causes of action. First, Plaintiffs allege that SPS violated RESPA by not responding to Plaintiffs' QWRs within the time required under the Act. Second, Plaintiffs contend that SPS breached the mortgage contract by retaining the insurance proceeds intended for the repair of the Property. Plaintiffs contend that this breach resulted in the total loss of the Property and mortgage investment. Third, Plaintiffs allege that SPS is liable in tort for conversion due to SPS' withholding of the insurance proceeds. Lastly, Plaintiffs seek recovery under an alternative theory of unjust enrichment.

SPS argues that it is entitled to summary judgment on all four of Plaintiffs' claims. First, SPS argues that it had no duty to respond to Plaintiffs' QWRS because Plaintiffs sent the QWRs to the wrong address. Second, SPS contends that Plaintiffs cannot recover for breach of contract because it had the authority to withhold the insurance proceeds pursuant to the mortgage agreement. Next, SPS contends that Plaintiffs' conversion claim is prescribed. Finally, SPS alleges that Plaintiffs have failed to establish all of the elements required to recover under a theory of unjust enrichment.

The bulk of Plaintiffs' opposition advances arguments and causes of action not contained in the complaint and not at issue in the instant motion for summary judgment. For example, whereas

Plaintiffs' complaint alleges that SPS violated RESPA by not responding to Plaintiffs' QWRs, Plaintiffs now allege that SPS violated RESPA by maintaining an excessive balance in Plaintiffs' escrow account. In addition, Plaintiffs currently allege four new grounds for breach of contract. Specifically, Plaintiffs allege that SPS breached the mortgage agreement by: (1) applying the insurance proceeds to the mortgage loan, (2) violating the "Notices" provision of the mortgage by sending correspondence to the Property rather than to Plaintiffs' attorney, (3) over-depositing funds in the escrow account, and (4) violating its own policies and procedures regarding private repairs. Plaintiffs also attempt to change the basis of their cause of action for conversion. Plaintiffs now assert that SPS committed the tort of conversion, not by withholding Plaintiffs' monies, but rather, by applying the insurance proceeds to Plaintiffs' mortgage balance. The Court addresses the arguments raised in Plaintiffs' opposition and SPS' motion in turn.

## LEGAL STANDARD

### I.    Motion to Amend Pleadings

Ordinarily, Rule 15(a) of the Federal Rules of Civil Procedure governs the amendment of pleadings. Where a court's permission for leave to amend is required because the amendment is not a matter of course, leave should be "freely given when justice so requires." *See S & W Enters., L.L.C. v. SouthTrust Bank of Alabama,*

*NA,* 315 F.3d 533, 535 (5th Cir. 2003) (quoting Fed.R.Civ.P. 15(a)). This is a lenient standard, but it does not apply if an amendment would require the modification of a previously entered scheduling order. *Filgueira v. U.S. Bank Nat. Ass'n*, 734 F.3d 420, 422 (5th Cir. 2013) (citing *id.*). Instead, Rule 16(b) governs the amendment of pleadings "after a scheduling order's deadline to amend has expired." *Id.* (quoting *Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 348 (5th Cir. 2008). Under Rule 16(b)(4), "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). A court is to consider the following factors when determining whether good cause exists: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *Filgueira*, 734 F.3d at 422. Ultimately, Rule 16(b) requires a party "to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension." *S & W Enters., LLC*, 315 F.3d at 535.

## II. **Summary Judgment**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id*. at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may

satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g.*, *id.* at 325; *Little*, 37 F.3d at 1075.

## DISCUSSION

### I.  Plaintiffs' Motion for Leave to File an Amended Complaint

The Court construes the new arguments raised in Plaintiffs' opposition as a motion for leave to file an amended complaint.[3]

---

[3] Plaintiffs filed a *Motion for Leave to File an Amended Complaint* on January 12, 2018 (Rec. Doc. 42). Magistrate Judge Knowles issued an order denying the motion on January 29, 2018 (Rec. Doc. 52). For the most part, the allegations contained in Plaintiffs' opposition mirror the causes of action asserted in Plaintiffs' *Motion for Leave to File an Amended Complaint* (Rec. Doc. 42). However, unlike the opposition, Plaintiffs' *Motion for Leave to File an Amended Complaint* asserts the following causes of action: (1) violations of the Truth in Lending Act ("TILA"), (2) fraud, (3) breach of fiduciary duty, and (4) breach of the duty of good faith and fair dealing.

On February 12, 2018, Plaintiffs filed a *Motion to Review the Magistrate Judge's Decision* (Rec. Doc. 70). This motion is currently set for submission on March 14, 2018. The motion alleges that Magistrate Judge Knowles erred in denying Plaintiffs' motion because he failed to address the four Rule 16(b) factors. Plaintiffs assert that Magistrate Judge Knowles erred by simply relying on the language in the scheduling order, *i.e.*, "[a]mendments to pleadings, third-party actions, cross-claims, and counter-claims shall NOT be filed." (Rec. Doc. 27).

The scheduling order provides that "all pre-trial motions . . . shall be filed and served in sufficient time to permit hearing thereon no later than February 14, 2018." Because Plaintiffs' *Motion to Review the Magistrate Judge's Decision* is set for submission on March 14, 2018, it was filed in violation of the scheduling order. The Court's order, however, addresses the causes of action

*See Ganther v. Ingle*, 75 F.3d 207, 211–12 (5th Cir. 1996); *Vernell v. United States Postal Serv.,* 819 F.2d 108, 110 (5th Cir. 1987); *Sherman v. Hallbauer,* 455 F.2d 1236, 1242 (5th Cir. 1972). Accordingly, because the scheduling order[4] provides that "[a]mendments to pleadings, third-party actions, cross-claims, and counter-claims shall NOT be filed," the Court analyzes Plaintiffs' motion for leave under Rule 16(b).

### a. The Explanation for the Failure to Timely Move for Leave to Amend

Plaintiffs assert that they had no means of obtaining the information required to put forth these new allegations prior to conducting discovery. Because discovery proceedings came to fruition after the deadline for amendments had passed, Plaintiffs argue that they could not have timely amended their complaint.

Essentially, Plaintiffs claim that they had no knowledge of any of the activity in their account from 2012 until 2017 because SPS intentionally sent all correspondence to a known vacant address. Plaintiffs claim that on January 6, 2014, Plaintiffs sent notice to SPS that the Property was uninhabitable and requested that all mail be sent to Plaintiffs' counsel. SPS admits

---

contained in Plaintiffs' opposition and the new causes of action that Plaintiffs seek leave to assert in their amended complaint.

[4] Two scheduling orders have been issued in this case. The original scheduling order, issued on July 13, 2016, was vacated on June 9, 2017, pursuant to a *Joint Motion to Continue Trial and Pre-trial Conference* (Rec. Doc. 23). The Court issued the current scheduling order on July 14, 2017.

that it received this letter. However, between January 2014 and July 2015, SPS sent approximately sixty documents to the uninhabited Property and none to Plaintiffs' counsel.[5] Plaintiffs argue that they had no way to know that SPS was sending correspondence to the uninhabited Property. Plaintiffs contend that if SPS had complied with Plaintiffs' requests, Plaintiffs would have known of SPS' activities long before the current scheduling order barring the amendment to pleadings. Thus, Plaintiffs assert because they received no communications from SPS, they were completely in the dark regarding the servicing of their loan prior to the recent discovery proceedings.

Plaintiffs argue that at the time they filed their original complaint, they had no documents—other than a single welcome letter—regarding their SPS loan. Plaintiffs provide no explanation, however, as to why they did not receive any correspondence between August 2012, when SPS started servicing the loan, and January 2014, when Plaintiffs requested a different address for receiving correspondence. Moreover, in light of the fact that Plaintiffs allege that they failed to receive any correspondence from SPS for over four years, Plaintiffs' explanation is void of any discussion regarding any attempt to

---

[5] Whether SPS was obligated to comply with Plaintiffs' letter is contested by SPS. Plaintiffs attempt to assert a new cause of action for breach of the contract for SPS' failure to send correspondence to the substitute notice address. For the purposes of this prong, the Court only considers Plaintiffs' explanation for the failure to timely move for leave to amend.

collect mail delivered to the vacant property.  Rule 16(b) requires a party "to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension." *S & W Enters., LLC*, 315 F.3d at 535.  Plaintiffs could have easily obviated this issue by designating a forwarding address for mail sent to the vacant property.  Accordingly, the Court finds that this factor weighs against granting leave to amend.

### b.  The Importance of the Amendment

Plaintiffs attempt to assert new and amended causes of action against SPS for: (1) fraud, (2) violations of RESPA, (3) breach of contract, (4) breach of the duty of good faith and fair dealing, (5) breach of fiduciary duty, (6) violations of the Truth in Lending Act ("TILA"), (7) conversion, and (8) unjust enrichment. Plaintiffs contend that they will not be made whole unless they are permitted to bring allegations regarding these damages and activities of SPS.  Plaintiffs' allegations of fraud, breach of fiduciary duty, breach of the duty of good faith and fair dealing, and violations of TILA are entirely new claims.  Because these claims, if proven, carry penalties and statutory multipliers not otherwise provided in Plaintiffs' original causes of action, the Court finds that this factor weighs in favor of granting leave to amend.

### c. Potential Prejudice in Allowing the Amendment and the Availability of a Continuance to Cure Such Prejudice

With regard to the third and fourth factors, the Court determines that SPS would be prejudiced if the amendment is allowed at this late date. This case has been pending since March 3, 2016, and, to this point, discovery and trial preparation have proceeded on the basis of the allegations found within Plaintiffs' complaint. The newly-alleged causes of action, and the substantive changes to Plaintiffs' original causes of action, will likely require additional research and discovery. Because the deadlines for discovery and dispositive motions have passed, the Court would need to extend these pre-trial deadlines. The delay associated with such an extension would result in additional expense to SPS, *See S & W Enterp.,* 315 F.3d at 537; *See Parish v. Frazier,* 195 F.3d 761, 763–64 (5th Cir. 1999), and the prejudice from the additional expense could not be cured by a continuance. *Ross v. Houston Hous. Auth.*, No. 09-2361, 2010 WL 1726908, at *3 (S.D. Tex. 2010) ("The prejudicial expense related to conducting additional, repetitious discovery cannot be cured by extending the current deadlines."); *see also Smith v. BCE Inc.*, 225 Fed. Appx. 212, 217 (5th Cir. 2007) (defendant would be prejudiced by proposed amended complaint, which contained new theory of recovery, five months after deadline to amend and two weeks before dispositive motions deadline).

"[T]o the extent the prejudice related to the expiration of the discovery period and motions deadline could be cured by reopening discovery and allowing supplemental briefing on dispositive motions, the Court has 'broad discretion to preserve the integrity and purpose of the pretrial order.'" *Ross v. Houston Hous. Auth.*, No. 09-2361, 2010 WL 1726908, at *3 (quoting *S & W Enters.*, 315 F.3d at 535 (citations omitted)). Although a continuance could possibly cure some of the prejudice to SPS, such a remedy would delay resolution of the case and add to SPS' expenses. *See Garza v. Allstate Texas Lloyd's Co.*, 284 F. Appx 110, 113 (5th Cir. 2008). Further, "a continuance would not . . . serve to enforce local rules or court imposed scheduling orders." *See id.* After two years of pending litigation, and a previous continuance, the Court concludes that allowing the amendment now would unnecessarily disrupt the Court's docket. The Court in this case exercises its discretion to preserve the integrity of the current deadlines and, therefore, declines to grant a continuance. *See Reliance Ins. Co. v. Louisiana Land and Exploration Co.*, 110 F.3d 253, 258 (5th Cir. 1997) ("District judges have the power to control their dockets by refusing to give ineffective litigants a second chance to develop their case."). Accordingly, the third and fourth factors weigh against granting leave to amend.

Because Plaintiffs have failed to demonstrate due diligence or good cause for leave to amend, the Court now turns to address SPS' motion with respect to the claims originally asserted in Plaintiffs' complaint.

## II. Summary Judgment

### a. RESPA

The Court first addresses Plaintiffs' claim under RESPA. The facts material to this claim are not in dispute. Plaintiffs allege that SPS violated RESPA requirements by failing to respond to the two QWRs Plaintiffs mailed to SPS on November 12, 2013, and December 30, 2013. SPS argues that it had no duty to respond to these QWRs because Plaintiffs failed to send their correspondence to the appropriate address.

"RESPA is a consumer protection statute that imposes a duty on servicers of mortgage loans to acknowledge and respond to inquiries from borrowers." *Bivens v. Bank of America, N.A.*, 868 F.3d 915, 918 (11th Cir. 2017). "When a borrower submits a QWR—written correspondence that includes the borrower's name and account and sufficient detail about the information sought—the servicer must provide 'a written response acknowledging receipt of the correspondence' and take certain other responsive actions within specified time periods."[6] *Id.* (quoting 12 U.S.C. §

---

[6] *See*, *e.g.*, 12 U.S.C. § 2605(e)(1)(A) ("If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan,

2605(e)(1)(A), (e)(1)(B), (e)(2)).  To assist servicers with the
task of providing consumers with timely information, RESPA's
implementing regulations allow servicers to establish a designated
address for QWRs.  *See Roth v. CitiMortgage Inc.*, 756 F.3d 178,
182 (2d Cir. 2014).  Specifically, 24 C.F.R. § 3500.21(e)(1)
provides, "By notice  . . . included in the Notice of Transfer .
. . a servicer may establish a separate and exclusive office and
address for the receipt and handling of qualified written
requests."  24 C.F.R. § 3500.21(e)(1).  If a servicer designates
a particular address for receiving QWRs, a borrower must mail his
or her QWR to that address to trigger the servicer's duty to
respond.  *See Roth*, 756 F.3d at 182 ("[F]ailure to send the
requests to the designated address does not trigger the servicer's
duties under RESPA.") (alterations omitted); *see also Berneike v.
CitiMortgage, Inc.*, 708 F.3d 1141, 1149 (10th Cir. 2017) ("Receipt
at the designated address is necessary to trigger RESPA duties.");
*Steele v. Green Tree Servicing*, LLC, No. 09-0603, 2010 WL 3565415,
at *3 (N.D. Tex. 2010) ("[T]he court holds that Green Tree never
received a qualified written request because the [plaintiffs]'s
letters were not sent to the exclusive address that Green Tree
specified.").

---

the servicer shall provide a written response acknowledging receipt of the
correspondence within 5 days (excluding legal public holidays, Saturdays, and
Sundays) unless the action requested is taken within such period.)

Plaintiffs concede that they received a "Notice of Transfer" letter from SPS. The letter reads: "All written requests must be sent to the address listed below for Disputes/Inquires, as this is our exclusive address for processing these matters. If you send your request or dispute to any other address, it may not be processed in accordance with our Customer Service Timelines." (Rec. Doc. 49-16 at 1). The letter also provides three separate mailing addresses for "Disputes/Inquiries," "Payment Remittance," and "General Correspondence," and designates the mailing address for "Disputes/Inquiries" as "P.O. Box 65227, Salt Lake City, Utah 84165." *Id.*

The Court finds that SPS clearly established "P.O. Box 65227, Salt Lake City, Utah 84165"as the exclusive mailing address for QWRs. *Bivens*, 868 F.3d at 917-21 (finding that SPS had designated an exclusive address for receiving QWRs based on the same language contained in SPS' Notice of Transfer). The Plaintiffs' QWRs, however, were not sent to this address. The record reflects that Plaintiffs mailed two letters, captioned "R.E.S.P.A. Qualified Written Request[s]," to "P.O. Box 70369, Pasadena, CA 91117" rather than to SPS' exclusive QWR address. (Rec. Doc. 68-12 at 1, 5). Because a reasonable trier of fact could only find that SPS established an exclusive location at which it would accept QWRs, and that Plaintiffs never sent a proper request to that address, SPS had no duty to respond to Plaintiffs' letters. *Bivens*, 868

F.3d at 917-21 (concluding that SPS had no duty to respond where the plaintiff failed to mail his QWR to SPS' designated QWR address— P.O. Box 65227, Salt Lake City, Utah 84165). SPS' motion for summary judgment is therefore granted as to the RESPA claim.

### b. Breach of Contract

Plaintiffs argue that SPS breached the mortgage agreement by retaining the insurance proceeds intended for the repair of the Property. SPS contends that the mortgage agreement grants it the authority to disburse the insurance proceeds periodically and in accordance with repair progress. Further, SPS contends that it did not breach the mortgage agreement because Plaintiffs failed to meet the completion percentage required for an additional disbursement. SPS argues that Plaintiffs agreed to pay for the cost of the repair upfront and, under SPS' policy for monitoring private repair claims, Plaintiffs were required to achieve 50% completion before SPS would make a second disbursement. Thus, SPS contends that it rightfully withheld the insurance proceeds because Plaintiffs failed to meet the required 50% completion threshold.

Notably, Plaintiffs' opposition fails to address SPS' argument regarding its authority to withhold insurance proceeds under the mortgage agreement. Instead, Plaintiffs allege a violation of SPS' own internal policies and procedures as the basis of their breach of contract claim. Plaintiffs assert that SPS

breached the mortgage agreement because it failed to make a second disbursement of insurance proceeds although the inspection revealed that Plaintiff had completed 25% of the repairs. Plaintiffs contend that, due to SPS' intentionally opaque policy regarding when and how insurance proceeds are to be disbursed, an issue of material fact exists regarding whether SPS' policy requires it to release a second disbursement at 25% or 50% repair completion.

In *Dabney v. Countrywide Home Loans, Inc.*, the court considered whether a mortgage lender was required to disburse all insurance proceeds to a borrower once repairs were deemed feasible. 428 Fed. Appx. 474, 476 (5th Cir. 2011) (per curiam). The contract authorized the lender to "disburse proceeds for the repairs and restoration . . . in a series of progress payments as the work is completed." *Id.* The contract also granted the lender the authority to "withhold the insurance proceeds until [the lender] had been afforded an opportunity to inspect . . . to ensure that the work has been completed." *Id.* Reasoning that the lender's inspection revealed that the plaintiff had only completed fifteen percent of the repairs, even though thirty-three percent of the funds had been disbursed, the court concluded that the lender was "fully justified in refusing to disburse additional proceeds." *Id.*

The Court reaches the same decision here. The mortgage agreement at issue in *Dabney* and the one presently before the Court contain the same broad grant of authority to the lender regarding the disbursement of insurance proceeds. Specifically, Plaintiffs' mortgage agreement provides:

> "Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, *Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction*, provided that such inspection shall be undertaken promptly. *Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.*"

(Rec. Doc. 49-2 at 8) (emphasis added). Like the agreement in *Dabney*, the mortgage agreement clearly grants SPS the authority to withhold insurance proceeds subject to its satisfaction of the performed repairs. Such a practice has been upheld in this circuit. *See Dabney*, 428 Fed. Appx. at 476; *see also Suffern v. Countrywide Home Loans, Inc.*, 06-0358, 2006 WL 1999204, *2-3 (E.D. La. 2006) (dismissing plaintiff's breach of contract claim alleging a delay in distributing insurance proceeds where the mortgage company made a pre-inspection disbursement of $15,000 and a second/final disbursement three-weeks later of $137,488 after the inspection revealed that 85% of the necessary repairs had been

completed).  SPS' authority to retain the insurance proceeds under the mortgage agreement is further buttressed by Plaintiffs' voluntary election to fund their own repairs.  Prior to any disbursement of insurance proceeds by SPS, Plaintiffs signed a Private Repairs Affidavit whereby Plaintiffs agreed to pay for all repair materials upfront.  The Affidavit contains the following language:

> We hereby guarantee that if we are permitted to perform the repairs ourselves for the property noted, *we would be responsible for payment in full for all materials we may need in relation to the restoration* . . . All repairs will be completed in a workmanlike manner and *we will accept the results of any inspections conducted by Select Portfolio Servicing, Inc.*

(Rec. Doc. 49-7 at 1) (emphasis added).  Although Plaintiffs agreed to "be responsible for payment in full for all materials [they] may need in relation to the restoration," it is undisputed that Plaintiffs never used any of their personal funds to repair the Property.  The only repairs made to the Property were repairs funded by SPS' initial $10,000 disbursement.  Once the initial disbursement was depleted, Plaintiffs made numerous attempts to request a second disbursement from SPS.  For example, Plaintiffs' letter to SPS dated March 27, 2013, provides:

> "The Harney's are in need of the funds currently in your possession to make the repairs to their home . . . The damages far exceed the amount of money they have received from the insurance company thus far. . . It is my understanding that [SPS] released a small amount to the Harney's to get started on repairs. However, the amount

is not enough to make any repairs other than the gutting
of the property, which has been done."

(*See* Rec. Doc. 68-10 at 1). [7]   In an attempt to avoid their

obligations, Plaintiffs sent letters to SPS containing estimates

of the expected cost of repairs instead of actually paying for any

repair materials themselves.  Seemingly, from Plaintiffs' point of

view, Plaintiffs had no duty to repair the Property until SPS

disbursed additional insurance proceeds.  This position, however,

is in direct contravention of the express language of the mortgage

agreement and Private Repair Affidavit.  Plaintiffs cannot agree

to self-fund the repairs and thereafter request that SPS make an

additional disbursement of the insurance proceeds to enable

Plaintiffs to continue making repairs.  SPS was not obligated to

make any additional disbursements to Plaintiffs in the absence of

Plaintiffs engaging in any self-funded repair.  Plaintiffs have

failed to direct the Court to any controlling or persuasive

authority which would lead it to find otherwise.  Accordingly,

the Court concludes that SPS is entitled to summary judgment on

Plaintiffs' breach of contract claim.[8]

---

[7] "Please also refer to my letters of June 4, 2013 and March 27, 2013 requesting
that [SPS] release additional monies it is holding in escrow so that the Harney's
can *begin* making repairs to their property." (Rec. Doc. 68-10 at 60) (emphasis
added).

[8] The Court finds that any alleged factual dispute regarding the completion
percentage required for an additional disbursement is of no moment. SPS contends
that its policies regarding the monitoring of private repair claims provide
that 50% completion is required for a second disbursement. (Rec. Doc. 49-4 at
2).  Plaintiffs contend that SPS' corporate representative, Diane Weinberger,
testified during SPS' 30(b)(6) deposition that a second disbursement should be
made after 25% of repairs were completed.  The only inspection performed on

### c. Conversion

Next, SPS moves for summary judgment on Plaintiffs' conversion claim. Plaintiffs' complaint alleges that SPS "committed and continues to commit the delict of conversion upon Plaintiffs by withholding from Plaintiffs' possession, monies rightfully theirs." SPS argues that this claim is prescribed because Plaintiffs brought the conversion claim more than a year after they knew or should have known of SPS' alleged tortious conduct.

The tort of conversion is committed when one wrongfully does any act of dominion over the property of another in denial of or inconsistent with the owner's rights. *See Dual Drilling Co. v. Mills Equip. Inv., Inc.*, 98-343 (La. 1998), 721 So. 2d 853, 857; *see also Security Home Mortgage Corp. v. Bogues*, 519 So. 2d 307 (La. App. 2d Cir. 1988). Any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion. *See Quealy v. Paine, Webber Jackson & Curtis, Inc.,* 475 So. 2d 756 (La.1985); *see also Hampton v. Hibernia Nat. Bank*, 598 So. 2d 502, 504 (La. App. 2d Cir. 1992).

---

Plaintiffs' Property revealed that 9% of the repairs had been completed. (Rec. Doc. 49-10 at 1). Plaintiffs agreed in the Private Repairs Affidavit that they would "accept the results of any inspections conducted by Select Portfolio Servicing, Inc." (Rec. Doc. 49-7 at 1). Accordingly, whether SPS' corporate representative correctly stated the required completion percentage for a second disbursement in her deposition is of no moment. Plaintiffs achieved neither 50% nor 25% completion.

"Delictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained." La. Civ. Code Ann. art. 3492. Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. *Campo v. Correa*, 2001-2707, pp. 11-12 (La. 6/21/02), 828 So. 2d 502, 510 (citation omitted). "An injured party has constructive notice of his condition when he possesses information sufficient to incite curiosity, excite attention or put a reasonable person on guard to call for inquiry." *Martinez Mgmt., Inc. v. Caston*, 39,500, p. 5 (La. App. 2 Cir. 4/13/05), 900 So. 2d 301, 305 (citing *Boyd v. B.B.C. Brown Boveri, Inc.*, 26,889, p. 8 (La. App. 2 Cir. 5/10/95), 656 So. 2d 683). "Ordinarily, the party pleading prescription bears the burden of proving that the plaintiff's claims have prescribed." *Terrebonne Parish School Bd. v. Mobil Oil Corp.,* 310 F.3d 870, 877 (5th Cir. 2002); *Quality Gas Products, Inc. v. Bank One Corp.,* 03-1859, p. 4 (La. App. 1st Cir. 6/25/04), 885 So. 2d 1179, 1181. However, once it is shown that more than a year has elapsed between the time of the tortious conduct and the filing of a tort suit, the burden shifts to the plaintiff to prove either suspension, interruption, or some exception to prescription. *See In re Moses,* 2000-2643, p. 6 (La.

2001), 788 So. 2d 1173, 1177; *see also Matias v. Taylors Int'l Servs., Inc.*, No. 09-3256, 2010 WL 3984581, at *3 (E.D. La. 2010).

Plaintiffs initiated the instant lawsuit on March 9, 2016. As discussed *supra*, between March 27, 2013, and October 9, 2013, Plaintiffs sent four letters to SPS requesting that it release the additional insurance proceeds that it held in escrow. (Rec. Docs. 68-10 at 1, 12, 60, 66). Such evidence demonstrates that no genuine issue of material facts exists with respect to whether Plaintiffs knew or should have known that SPS was withholding their insurance proceeds. *See Hampton*, 598 So. 2d at 505 (concluding that the plaintiff's claims were prescribed where plaintiff had sent several letters requesting that his bank requesting that his money be returned to his checking account).

Moreover, although Plaintiffs' complaint alleges that the conversion was continuous in nature, and thus, not prescribed, Plaintiffs expressly abandoned this argument and have failed to offer any summary judgment evidence in support of this assertion.[9] Because a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions, *Little*, 37 F.3d at 1075, the Court finds that Plaintiffs have failed to meet their burden of establishing an exception to prescription. Accordingly,

---

[9] "Plaintiffs need not rely on the continuing tort doctrine to stave off prescription." (Rec. Doc. 68 at 26).

the Court concludes that the La. Civ. Code Ann. art. 3492 liberative prescription has run on SPS' conversion claim.

### d. Unjust Enrichment

Lastly, Plaintiffs allege, as an alternative theory, that SPS was unjustly enriched by its collection and retention of Plaintiffs' insurance proceeds. SPS contends that Plaintiffs cannot succeed on their unjust enrichment claim because Plaintiffs have another remedy at law.

The Louisiana Supreme Court has stated that in order to prove unjust enrichment, there must be: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and resulting impoverishment; (4) an absence of justification or cause for the enrichment and the impoverishment; and (5) no other remedy a law available to the plaintiff. *See Insulation Techs., Inc. v. Indus. Labor & Equip. Servs., Inc.*, 2013-0194, p. 6 (La. App. 4 Cir. 8/14/13), 122 So. 3d 1146, 1150 (citing *Baker v. Maclay Properties Co.,* 94-1529, pp. 18-19 (La. 1/17/95), 648 So. 2d 888, 897). The Louisiana legislature has codified unjust enrichment in La. Civ. Code art. 2298, which provides: "[a] person who has been enriched without cause at the expense of another person is bound to compensate that person." La. Civ. Code art. 2298. The article further provides that "[t]he remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment." *Id.* "The unjust enrichment remedy is only

applicable to fill a gap in the law where no express remedy is provided." *Walters v. MedSouth Record Mgmt., LLC*, 2010-0353 (La. 6/4/10), 38 So. 3d 243, 244.

Plaintiffs' unjust enrichment claim cannot succeed because Plaintiffs cannot establish an absence of another remedy at law available to them. As discussed *supra*, Plaintiffs' complaint alleges damages for breach of the mortgage contract as well as a delictual action for conversion. It is well-settled under Louisiana law that "[t]he remedy of unjust enrichment is subsidiary in nature, and shall not be available if the law provides another remedy." *Walters*, 38 So. 3d at 244 (internal citations omitted). Because Plaintiffs have alleged causes of action for breach of contract and in tort, Plaintiff cannot establish the fifth element, a lack of another remedy at law. *Id.* ("Having pled a delictual action, we find plaintiff is precluded from seeking to recover under unjust enrichment."); *Insulation Techs., Inc.*, 122 So. 3d at 1151 ("The existence of a contractual remedy precludes a plaintiff from maintaining a cause of action in unjust enrichment for the same damages."); *Wilkins v. Hogan Drilling Co.*, 471 So. 2d 863, 867 (La. App. 2d Cir. 1985) (stating that one cannot recover under unjust enrichment when there is an agreed contract between the parties."). Furthermore, the Court's grant of summary judgment with regard to Plaintiffs' RESPA, breach of contract, and conversion claims has no impact on Plaintiffs'

claim for unjust enrichment. *Dugas v. Thompson*, 2011-0178 (La. App. 4 Cir. 6/29/11), 71 So. 3d 1059, 1061 ("[T]he mere fact that a plaintiff does not successfully pursue another available remedy does not give the plaintiff the right to recover under the theory of unjust enrichment.").

**CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that SPS' *Motion for Summary Judgment* **(Rec. Doc. 49)** is **GRANTED**.

**IT IS FURTHER ORDERED** that all of Plaintiffs' claims against SPS are hereby **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that *Plaintiffs' Motion for Appeal/Review of Magistrate Judge's Order* **(Rec. Doc. 70)** is hereby **DENIED.**

New Orleans, Louisiana, this 7th day of March, 2018.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE